IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 15, 2020 Session

## STATE OF TENNESSEE v. MICHAEL DOMONIC SALES

**Appeal from the Circuit Court for Lincoln County**
**No. 2016-CR-23     Forest A. Durard, Jr., Judge**

_____

**No. M2017-01116-CCA-R3-CD**

_____

A Lincoln County jury convicted Defendant, Michael Domonic Sales, of first degree premeditated murder, for which he received a life sentence. After filing a notice of appeal, Defendant filed a motion with this court requesting that the court stay his direct appeal so that he might seek relief through a petition for writ of error coram nobis. This court granted Defendant's motion to stay his direct appeal, and Defendant filed a petition for writ of error coram nobis in the trial court. Following a hearing, the trial court denied relief. On appeal, Defendant argues that: (1) the trial court erred in failing to act as the thirteenth juror and grant a judgment of acquittal based on Defendant's claim of self-defense; (2) he is entitled to a new trial based on improper prosecutorial argument, including the prosecutor's assertion that Defendant was a Crips gang member and that Defendant's possession of a weapon as a convicted felon prevented his claim of self-defense; and (3) the trial court erred in denying his petition for writ of error coram nobis. After a thorough review of the facts and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and TIMOTHY L. EASTER, JJ., joined.

Russell L. Leonard, Monteagle, Tennessee, for the appellant, Michael Dominic Sales.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Robert J. Carter, District Attorney General; and Ann Filer, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

The conviction at issue in this appeal stems from a confrontation that occurred at a party in Fayetteville on September 6, 2015, during which Defendant pulled out a revolver and shot twenty-year-old Carlton Capone Caruth ("the victim") in the forehead at close range. The shooting occurred in front of multiple eyewitnesses, and Defendant was quickly identified as the shooter. Although Defendant fled the scene, authorities located him in Shelbyville seven days later and arrested him. The Lincoln County Grand Jury subsequently issued an indictment, charging Defendant with first degree premeditated murder.

### *Jury trial*

At trial, Detective Lieutenant Joel Massey of the Fayetteville Police Department testified that he received a call from police dispatch around 1:30 a.m. on September 6, 2015, informing him that shots had been fired at The Game Room and that "a person was down." Detective Massey explained that The Game Room was located on South Main Street, with the city garage on one side and a vacant lot on the other side. Detective Massey recalled that, when he responded to The Game Room, he saw the victim lying on his back in the parking lot with a gunshot wound to the forehead. He said that the victim was bleeding from his mouth and that "[i]t looked like his teeth may have broken." Detective Massey said that it appeared the victim "went down face-first" after being shot. Detective Massey explained that, after sunrise, officers searching the surrounding area found six .40 caliber shell casings and a .40 caliber bullet on DeSoto Street. He estimated that these items were located about ninety feet away from where the victim fell.

Detective Massey stated that Defendant was quickly identified as a suspect in the shooting. He explained that detectives obtained Defendant's cell phone number and executed a search warrant for Defendant's cell phone records. Detective Massey testified that the cell phone records indicated that Defendant was in Fayetteville at the time of the shooting. Detective Massey explained that, after a search, Defendant was arrested in Shelbyville a week later. He said that the weapon used to kill the victim was never located.

During cross-examination, the following colloquy occurred:

> [DEFENSE COUNSEL]: [W]here [did] the six .40 caliber shell casings came from?

[DETECTIVE MASSEY]: I do not know that.  I just know what I heard.

[DEFENSE COUNSEL]: Well, what did you hear?

[DETECTIVE MASSEY]: That Cory Eddings shot.

[DEFENSE COUNSEL]: Okay.  Is Cory Eddings a member of the [Gangster Disciples]?

[DETECTIVE MASSEY]: I do not know that.

Detective Massey testified that he did not know if the party at The Game Room was for the Gangster Disciples and that he did not know if the victim was a member of the gang.  He stated that the weapon that fired the .40 caliber shell casings was never located.

Sergeant Mark Browning of the Fayetteville Police Department testified that he was working routine patrol on the morning of the shooting and recalled that, around 1:00 or 1:30 a.m., he drove past The Game Room and noticed a large crowd outside the building.  He said that, a few seconds after he passed The Game Room, he heard multiple gunshots.  Sergeant Browning went through an intersection, stopped at a stop sign, and then heard more gunshots.

Sergeant Browning testified that he returned to The Game Room and saw multiple cars leaving the scene.  He said that he found the victim lying on the ground on his back with a bullet wound to the left side of his head.  After checking the victim for a pulse, Sergeant Browning looked around the victim for a weapon or shell casings but did not see anything.  He said that he did not move the victim's body.

Deputy Brian McCrory of the Lincoln County Sheriff's Department testified that, around 1:30 a.m. on September 6, 2015, he was traveling down South Main Street in Fayetteville when he passed by The Game Room.  He noticed a couple hundred people congregated outside in front of the building.  He then heard two gunshots in quick succession.  He stated that, a few seconds later, he heard two more gunshots and saw people running across the street.  Deputy McCrory looked towards The Game Room and saw the victim lying in the parking lot.  He turned his patrol car around and pulled up next to the victim.  He testified that the victim was lying on his back and had a gunshot wound on the left side of his head.  Deputy McCrory checked the victim and found that he had no pulse.  He testified that, after calling for backup, he "looked around on the ground for a weapon or any other type evidence" but did not see anything.

Detective Sergeant Dion Shockley of the Fayetteville Police Department testified that, after initially responding to the scene of the shooting in the early morning hours of September 6, 2015, he went to the residence of Aaron Pitts, where he obtained consent to search Mr. Pitts' vehicle. Detective Shockley explained that Mr. Pitts had been at The Game Room at the time of the shooting and that the rear passenger-side window of his vehicle had been shot out. The bullet went through the window, struck the back seat, and then lodged in the rear corner panel of the vehicle. Detective Shockley retrieved the bullet and collected it as evidence. After speaking to Mr. Pitts about where his vehicle had been parked, Detective Shockley returned to the crime scene around 8:00 a.m. and looked for the glass from Mr. Pitts' vehicle, which he located "in the vacant lot that was on the north side . . . of the building[.]" Detective Shockley recalled that detectives found .40 caliber shell casings about twenty-five to thirty yards from the glass from Mr. Pitts' vehicle, as well as a spent bullet out in the road on DeSoto Street.

On cross-examination, Detective Shockley said that he was aware of the Gangster Disciples and agreed that they were known by law enforcement to be in the area. He stated that he did not know if Mr. Pitts was a member and that he did not know if any gang members or their associates were at The Game Room the morning of the shooting.

Dr. Feng Li, the Chief Medical Examiner for Metropolitan Nashville-Davidson County, testified that he performed the victim's autopsy. Dr. Li explained that the victim had a gunshot wound to the left side of the forehead, multiple abrasions, and chipped teeth. Dr. Li stated that the victim likely chipped his teeth when he fell and hit the ground. Dr. Li said that he could not rule out the possibility that the victim turned himself over after falling to the ground. Dr. Li said that the gunshot wound was a "near contact" wound, meaning that the firearm was very close to the victim at the time it was shot, and that he recovered the bullet from the victim's brain and turned it over to law enforcement. He said that the victim's toxicology report showed that he had a small amount of alcohol and marijuana in his system. Dr. Li opined that the victim's cause of death was a gunshot wound to the head and that the manner of death was homicide.

Emily Caruth, the victim's mother, testified that the victim graduated from Lincoln County High School in 2013 and then obtained some college credits at Nashville Tech and Tennessee State University. Mrs. Caruth said that the victim was employed at the time of his death. She explained that their family owned the property on South Main Street where The Game Room was located. She explained that, although The Game Room had not been open as an official business, they had set up pool tables in the front room of the building. Mrs. Caruth explained that her husband had been approached about leasing the building for a few parties but that their family had not hosted any parties there.

Ralphel Ford, the victim's friend, testified that he had grown up in Fayetteville with the victim. Mr. Ford explained that he also knew Defendant because Defendant stayed with a relative in Fayetteville for a time. He said, however, that he had not seen Defendant since childhood.

Mr. Ford explained that, on September 5, 2015, he attended the party at The Game Room. When he entered the building, he was frisked for weapons by Brandon Fleming, who was patting down everyone who entered the party that night. Mr. Ford recalled that the entrance at the front door of the building was roped off, and there was only one door through which people could enter. Mr. Ford explained that there were pool tables, a bar area, and some tables and chairs in the front room; in the back room, there was a dance floor where a DJ was playing music. Mr. Ford said that he saw Defendant around 11:30 p.m. in the front room near the pool tables. He spoke to Defendant and shook his hand. Mr. Ford recalled that Defendant was "calm" and "just chilling."

Mr. Ford testified that, later in the evening while he was playing pool with Cory Eddings, the victim reported that "he had just had an altercation with some guy in the back[.]" Mr. Ford went with the victim to the back room, and Defendant approached them. Mr. Ford testified that Defendant seemed upset and was "acting hyper." Defendant was "bouncing around" and saying that he wanted to fight. Mr. Ford was unable to get Defendant to calm down, and someone suggested that the victim and Defendant take the argument outside.

Mr. Ford testified that he went out the front door with the victim, Mr. Eddings, and Defendant. Mr. Ford testified that he, Mr. Eddings, and the victim did not have any weapons. He said that, once outside, Defendant kept saying he wanted to fight the victim and that Defendant called the victim "a b**ch." Mr. Ford stated that the victim stayed behind him and did not attempt to fight Defendant. Defendant then ran past Mr. Ford, and Mr. Ford heard a gunshot. When he turned around, he saw the victim lying on his back on the ground. Mr. Ford testified that, prior to the shooting, no one was behind or to the side of Defendant and that nothing prevented Defendant from "going to the alley on his left and running away backwards, or to the right[.]" On cross-examination, Mr. Ford said that he was not a member of the Gangster Disciples. When asked if Mr. Eddings and the victim were members, he said that he did not know.

Cainan Johnson testified that he was the victim's cousin and that they grew up together in Fayetteville. He said that he had never seen Defendant before the night of September 5, 2015. Mr. Johnson recalled that, when he entered the party at The Game Room, he went through the front entrance, paid the $10 entrance fee, and was searched by Mr. Fleming. Mr. Johnson stated that he walked into the building with the victim and that Mr. Fleming also frisked the victim. Mr. Johnson said that neither he nor the victim

had any weapons. He recalled that the victim stayed in the front room playing pool while he made his way to the back room.

Mr. Johnson stated that the back room was crowded, the music was loud, and the lights were turned down. He recalled that the victim eventually came to the back room around 11:45 p.m. He said that, at one point, Defendant accused the victim of bumping into him and began arguing with the victim. Defendant was "trying to get in [the victim's] face," and Mr. Johnson stood up for the victim. Mr. Johnson testified that he thought the issue had "died down," and he continued to party. He then saw a line of people going towards the front of the building, and someone told Mr. Johnson that the victim was outside fighting. Mr. Johnson recalled that he ran outside and saw a "huddle" of six or seven people in front of the building where Defendant and the victim were arguing. He testified that Defendant said, "I'm a Crip," and "I will shoot you in the face."

Mr. Johnson testified:

> . . . I knew I had a gun in my car, but I was thinking to myself should I stay here or should I get the gun. That is when [Mr. Eddings] told me . . . go get the gun. Get the gun. I ran around the building, . . . got the gun and I was trying to load the gun.

Mr. Johnson said that he heard a gunshot that came from the front of the building. He tossed the gun to Mr. Eddings and jumped into his car. Mr. Johnson testified that, when Defendant ran around the corner of the building and past his car, Mr. Eddings started shooting at Defendant. Mr. Johnson said that he pulled his car to the front of the building and found the victim lying on the ground. He attempted to go to the victim but was held back and not able to touch him. He testified that there were no weapons around the victim.

On cross-examination, Mr. Johnson denied that he was a member of the Gangster Disciples, although he said that he knew there were some members of the gang living in Fayetteville. Mr. Johnson said that the gun in his car belonged to Mr. Eddings; he said that he did not know how often Mr. Eddings carried the gun or why it was in his car that night. He stated that he did not know if Mr. Ford was known to carry a weapon.

Tony Brown testified that he was a life-long friend of the victim's father, Carlton Caruth. Mr. Brown stated that he attended the party at The Game Room on the night of September 5 because a "known rapper" was going to be performing. He recalled that individuals from Pulaski were promoting the party. He said that he paid the cover charge and was frisked when he entered. Mr. Brown recalled that, around 11:30 p.m. or 12:00

a.m., he saw a "movement in the crowd." He could tell something was going on because people were coming out of the back room and moving to the front door. He saw Defendant walk outside with Mr. Ford, the victim, and Mr. Eddings. Mr. Brown explained that he stood at the front door to watch what was happening. Mr. Brown testified that Defendant could have easily walked away and that he was not prevented from leaving. He heard Defendant call the victim "a n****r and a b**ch." He also heard Defendant say something about "shoot[ing] them in the face[.]" He said that the victim "flinched back" from Defendant and that Defendant pulled a gun from his waistband. Defendant then moved towards the victim, and Mr. Brown heard a gunshot. Mr. Brown said that he "hit the ground" and that, when he looked up, he saw the victim lying on the ground on his back. Mr. Brown stated that the victim did not have a weapon and that he made no movements as if he were drawing a weapon prior to the shooting. Mr. Brown testified that, when he went back inside to tell people there had been a shooting, he heard additional gunshots. Mr. Brown provided a statement to police the day after the shooting. He was shown a photographic lineup, and he identified Defendant as the person who shot the victim.

Cory Eddings testified that he grew up in Fayetteville and became friends with the victim when they played basketball together. Mr. Eddings explained that he had known Defendant when they were younger and that he had never had any problems with Defendant. Mr. Eddings testified that, on the night of September 5, 2015, he arrived at The Game Room between 10:00 and 11:00 p.m. Mr. Eddings stated that, after he paid the cover charge, Mr. Fleming patted him down. Mr. Eddings recalled that, when he first saw Defendant at the party, Defendant greeted him, and they spoke for several minutes. Mr. Eddings said that Defendant was in a good mood and that they had a friendly conversation.

Mr. Eddings testified that, later in the evening when he was in the back room, the victim said that someone had "bumped him" and then had "got[ten] smart" with him. When the victim pointed out Defendant, Mr. Eddings approached Defendant and said, "[M]y brother here said you bumped him or whatever[.]" According to Mr. Eddings, the victim said that he did not want any problems, but Defendant was "coming off aggressive like he was wanting to fight[.]" Mr. Eddings suggested that they go outside to talk. Defendant went out first, followed by Mr. Eddings and the victim. Mr. Eddings testified that he was standing beside the victim and that they were facing Defendant. He said that no one threatened Defendant. Mr. Eddings recalled that, at one point, Mr. Ford began talking to Defendant and that, thinking the incident was over, Mr. Eddings and the victim began walking back towards the building. Mr. Eddings stated that Defendant then called the victim "a b**ch" and that, when the victim turned around, Defendant shot the victim. Mr. Eddings explained, "[The victim] turned around and took a step back to him and that is when [Defendant] pulled a gun out[.]" Mr. Eddings recalled that Defendant said

- 7 -

something about shooting the victim in the face and that the victim "froze up" when he saw the gun, which Mr. Eddings described as a small revolver. Mr. Eddings said that Defendant shot the victim one time and the victim fell face first onto the ground.

Mr. Eddings said that he ran around the building towards his car and heard more gunshots. He admitted that Mr. Johnson tossed him a gun and that he shot the gun towards Defendant three or four times as Defendant ran past them. Mr. Eddings said that the gun he fired was a .40 caliber gun. He said that Defendant also shot up in the air as he was running away. Mr. Eddings stated that, before the shooting, no one was behind Defendant and that Defendant could have walked away from the victim.

On cross-examination, Mr. Eddings said that someone had dropped off the gun he used and put it in Mr. Johnson's car, "[j]ust in case if anything was . . . to happen." He said that he could not recall who told him about the gun. Mr. Eddings acknowledged that he used to be a member of the Gangster Disciples and agreed that there were gang members in Fayetteville. He said that he had been out of the gang for a year or two. The following colloquy then occurred:

> [DEFENSE COUNSEL]: You would not want to tell me whether [Mr. Johnson] was a [Gangster Disciple]; would you?
>
> [MR. EDDINGS]: I ain't got nothing to do with that. . . . You need to ask him[.]
>
> [DEFENSE COUNSEL]: You would not tell me whether [the victim] was a [Gangster Disciple]; would you?
>
> [MR. EDDINGS]: Still none of my business, sir.
>
> [DEFENSE COUNSEL]: You would not want to tell me if [Mr.] Ford was a [Gangster Disciple]; would you?
>
> [MR. EDDINGS]: That is a question you need to ask him.
>
> [DEFENSE COUNSEL]: Okay. Did they come out of Chicago originally?
>
> [MR. EDDINGS]: I don't know.

[DEFENSE COUNSEL]: I think, and correct me if I'm wrong, I think I heard part of your questioning by the General, you told [the victim] to tell [Defendant] . . . who he was. Did I misunderstand that?

[MR. EDDINGS]: Tell [the victim] to tell [Defendant] who he was?

[DEFENSE COUNSEL]: Yeah.

[MR. EDDINGS]: What do you mean?

[DEFENSE COUNSEL]: Well maybe like he was a G?

[MR. EDDINGS]: No, I never said that.

On redirect, the following exchange occurred:

[THE STATE]: Do you know if [Defendant] is in a gang or affiliated with a gang?

[MR. EDDINGS]: I mean I heard, like I said I can't say he say/she say but I heard he was a Crip. I heard it come out of his mouth that night.

[DEFENSE COUNSEL]: Object to hearsay, Your Honor.

THE COURT: Hang on, hang on. Part of the response was hearsay but the last part of the response was you said you heard what come out of the [D]efendant's mouth?

[MR. EDDINGS]: I heard come out of his mouth he said he was a Crip that night.

THE COURT: That portion would not be hearsay, the other testimony would be and should be disregarded by the jury.

When asked if Mr. Fleming was a Crip, Mr. Eddings responded, "He used to say he was."

Shaneda Small testified that she had lived in Fayetteville in September 2015 and that she had been friends with the victim. She said that she had seen Defendant around town but that she did not know him personally. Ms. Small recalled that she attended the party at The Game Room on the night of September 5. She said that she paid the cover charge but was not frisked because there was no female security.

Ms. Small stated that the back room of The Game Room was dimly lit and crowded and that there was loud music playing. She recalled that the victim was standing beside her in the back room when she saw Defendant walking around the room. She said that Defendant came between her and the victim and bumped into them. Ms. Small touched Defendant on his arm and told him to calm down and that his bumping into people was going to start a confrontation. Defendant responded, "I respect that" but then said that the victim had bumped into him. The victim said, "[M]y bad, bruh[,]" and Defendant responded, "I'm not no bruh[.]" Ms. Small recalled that the victim apologized but that Defendant asked the victim, "Do you know [who] the f*** I am?" She said that Mr. Eddings and Mr. Ford walked over and asked what was going on. Ms. Small testified, "And [Defendant] was like, umm, this little n**ga said umm, my bad bruh to me. Do[es] . . . he not know who I am? I'm a muthaf***in' Crip, n**ga. And, umm, we like stood back a little bit."

Ms. Small recalled that Mr. Eddings and Mr. Ford talked to Defendant and attempted to calm him. Eventually, they walked outside. Ms. Small stated that Defendant "was still aggressive and upset saying he wanted to fight." She recalled that she stood back with the victim. She said that the victim stepped up and again apologized but that Defendant did not accept the apology. Mr. Eddings and Mr. Ford continued to talk to Defendant, trying "to calm him down; telling him, you know, there was no problems."

Ms. Small testified that she heard Defendant threaten to kill the victim, so she went to her car. As she was getting into her car, she looked back and saw Defendant walk up to the victim. The victim stepped back and said, "[H]e got a gun y'all." Ms. Small testified that Defendant pulled a small revolver from his waistband and fired it at the victim's head. Ms. Small called 9-1-1 and stayed with the victim until emergency services arrived. She testified that Defendant was not surrounded or threatened before the shooting. Ms. Small explained that she later viewed a photographic lineup provided by law enforcement and identified Defendant from the lineup as the shooter.

On cross-examination, Ms. Small testified that no one touched the victim before emergency services arrived. She denied that Mr. Johnson felt around for a gun on the ground near the victim. Ms. Small testified that no one else had a gun at the time Defendant shot the victim. When asked how she knew no one else had a gun, she stated, "If someone else had a gun, I'm sure someone would have probably tried to do something instead of letting [Defendant] walk away once he killed [the victim]."

Detective Sergeant Adam Eubanks of the Fayetteville Police Department testified as an expert in cell phone technology as related to law enforcement. Detective Eubanks stated that, as part of the investigation, he issued search warrants to Verizon Wireless for

cell phone records of Defendant and Defendant's girlfriend, Ina Draper. From the information provided by Verizon in response to the search warrants, Detective Eubanks created a map of Defendant's and Ms. Draper's cell phone usage for September 5-6 to determine the location of the cell phones before, during, and after the shooting. Detective Eubanks explained, based on cell phone data, that Defendant's cell phone was in Fayetteville on the evening of September 5 until about 1:43 a.m. on September 6 when records indicated that his cell phone was in Shelbyville. Regarding Ms. Draper's cell phone records, Detective Eubanks stated that the records indicated that her cell phone was in Shelbyville on the evening of September 5 until at least 1:12 a.m. on September 6. Around 1:27 a.m. on September 6, the records showed that Ms. Draper's cell phone was in Fayetteville. He explained that her cell phone was back in Bedford County in the Shelbyville area by 2:09 a.m. on September 6.

Detective Eubanks stated that he reviewed text messages from Defendant's cell phone records. He said that, at 3:19 a.m. on September 6, Defendant's cell phone was used to send a text message that read, "I don't know he tried playing with me Shanta." Detective Eubanks testified that, based on the context of other messages, "Shanta" was the mother of Defendant's children. He said that Defendant received a text message at 3:16 a.m. from Shanta that read, "[You] should have stayed home." He then received another message that read, "What we gon[n]a do, I can't take this my heart hurts so bad." At 3:19 a.m., Defendant received another message from Shanta that read, "[J]us[t] talk to our girls f*** me."

Special Agent Zachary Burkhart of the Tennessee Bureau of Investigation (TBI) testified that he was asked to assist the Fayetteville Police Department with executing an arrest warrant on Defendant. During his attempts to locate Defendant, Agent Burkhart spoke to Defendant's father, who said that Defendant was possibly staying with a woman on Dover Street in Shelbyville. Agent Burkhart said that he spoke to the woman who owned the residence on Dover Street, and she confirmed that Defendant had been staying with her. Based on this information, Agent Burkhart was able to locate and arrest Defendant on September 13, 2015.

Special Agent Jessica Hudson testified that she worked as a forensic scientist in the Firearm and Toolmark Identification Unit of the TBI crime lab. She stated that she received the six .40 caliber cartridge cases and three bullets collected as evidence in the case. Agent Hudson testified that, based on her inspection, all six shell casings were shot from the same .40 caliber gun. Regarding the bullets, Agent Hudson explained that the bullet recovered from Mr. Pitts' car and the bullet found on DeSoto Street were both .40 caliber bullets with the same class characteristics but that because of the damage to the bullet found lodged in Mr. Pitts' car, she was unable to say the bullets were fired from the same gun. Agent Hudson said that the bullet recovered from the victim was a .38/.357

caliber class bullet and that "[t]he rifling characteristics . . . [were] common to a variety of .38/.357 caliber firearms[,]" including "a Llama, Smith and Wesson and Taurus."

Woodrow Sales, Defendant's uncle, testified that he was in Fayetteville on September 5, 2015, having a dinner with his sister, Thelma Buchanan. Mr. Sales said that Defendant was at the dinner and planned to stay at Ms. Buchanan's house that night with Mr. Sales. However, Defendant left Ms. Buchanan's house after dinner with another uncle, Devon Kibble.

Mr. Sales said that, in the early morning of September 6, he went outside to his car to retrieve his cell phone and heard a "burst of gunfire." He went around Ms. Buchanan's house and then heard another round of gunfire. Mr. Sales testified that Ms. Buchanan's house was about a block and a half away from The Game Room, and he estimated that he heard eight to ten gunshots that morning. He stated that an officer drove past him and asked if he had heard gunfire and that he told the officer it was coming from the direction of South Main Street. Mr. Sales recalled that, shortly after speaking to the officer, Mr. Ford ran up to the fence at Ms. Buchanan's house with a gun in his hand, "hollering, cussing." Mr. Sales told Mr. Ford to leave, and Mr. Ford ran to his grandmother's house, who lived nearby.

Thelma Buchanan, Defendant's aunt, testified that Mr. Ford showed up at her house on the morning of September 6. She explained that Mr. Ford's grandmother lived on the same street, about two houses away. She said that Mr. Ford was "wild and crazy" and was calling her names. She said that he had a gun but that Mr. Sales "ran him off[.]"

Ina Draper testified that she resided in Shelbyville. Ms. Draper said that her relationship with Defendant had been "on and off" for two years and that, in September 2015, she and Defendant had just broken up. Ms. Draper recalled that, on the evening of September 5, she was visiting some friends while Defendant was at the party in Fayetteville. Defendant sent her a text message around 11:30 p.m. or 12:00 a.m., saying that he needed her to pick him up. Defendant then called her and said that he was outside The Game Room waiting for her. Ms. Draper said that she eventually picked up Defendant near Ms. Buchanan's house; she then took him back to Bedford County and dropped him off in a park.

Ms. Draper stated that, to her knowledge, Defendant was not a violent person. She said that Defendant was not a gang member but "just hung around them sometimes." She explained that, while she was on her way to Fayetteville, Defendant called her and said not to pick him up at The Game Room and to, instead, pick him up at Ms. Buchanan's house. Ms. Draper recalled that, on their way back to Bedford County, Defendant's cell phone rang several times but that he did not answer. When Defendant finally answered

his phone, Defendant said, "[Y]eah, I'm already gone, I'm okay." She said that she heard from Defendant a few days after the shooting. When she asked where he was, Defendant would not tell her.

Defendant testified that, on the afternoon of September 5, 2015, he was in Fayetteville for a family dinner. He stated that his uncle, Mr. Kibble, picked him up and took him to the party at The Game Room around 11:30 or 11:45 p.m. He recalled that he waited in the back room for the scheduled entertainment to perform and that, while walking around the dance floor, he "may have bumped a person or two," but he apologized when that happened. Defendant said that he was standing by the bar on the dance floor when the victim came past him. Defendant testified that the victim bumped into him so hard that Defendant "tilted over" and almost dropped his drink. Defendant explained, "So when I . . . g[o]t my balance back, I looked back behind me and actually [saw] who it was who bumped me." He said that he asked the victim why the victim did not say "excuse me." Defendant continued, "And when I said that, [the victim] got like aggressive hostile with me, like he was trying to have a confrontation with me." Defendant said that the victim wanted to fight him and that several of the victim's friends grabbed Defendant and "rushed him" outside. Defendant denied that he was aggressive towards anyone. Defendant said that he texted Ms. Draper to come get him because he did not feel comfortable after seeing Mr. Ford at The Game Room. Defendant said that Mr. Ford, Mr. Eddings, and Desean Askins[1] were associated with or members of the Gangster Disciples.

Defendant recalled the victim and five other men—Mr. Eddings, Mr. Ford, Mr. Askins, A.J. Hicks, and another "[l]ight-skinned guy"—came outside. Defendant said that Mr. Hicks was his cousin and a known member of the Gangster Disciples. Defendant said that, once outside, Mr. Ford asked what was going on, and he told Mr. Ford that he did not want any problems. Defendant testified that he saw the "light-skinned guy" hand the victim "something." When asked if he thought the victim had a weapon, Defendant responded, "It could have been perceived [the victim] had a weapon[.]" Defendant admitted that he had a gun that night while at the party. He explained that he carried the gun because, a week prior, he and a friend had been "jumped" at a club in Tullahoma by members of the Gangster Disciples. He said that, after the fight, someone made a threat to him over Instagram.

Defendant testified that, once outside, the five other men tried to surround him. He said that he could not see the victim's hands but that the victim was coming towards him. Defendant said that he was scared, so he stepped to the right, fired a shot, and took

---

[1] Throughout the record, Desean Askins is referred to alternatively as "Deshawn Askins" and "Deshon Atkins." For the purposes of clarity, we will refer to him as Mr. Askins throughout this opinion.

off running. He admitted that he shot in the victim's direction. He said that he then ran through a parking lot and down DeSoto Street. Defendant said that he heard additional gunshots behind him about fifteen to twenty seconds later and realized that someone was shooting at him. Defendant fired his gun up in the air several additional times as he ran towards Ms. Buchanan's house. Defendant saw Ms. Draper driving towards Ms. Buchanan's house, and he got into Ms. Draper's car. Ms. Draper took him to Shelbyville and dropped him off at a park. Defendant stated that he saw on the news the next day that he was wanted for homicide.

Defendant said that he felt he had been "set up." He testified that he shot the victim because he believed his life was in danger and he acted in self-defense. He denied being affiliated with or a member of either the Gangster Disciples or the Crips.

On cross-examination, Defendant agreed that the victim was not involved in the fight in Tullahoma the week prior. Defendant testified that he did not say anything to the victim before shooting the victim, and he acknowledged that no one pulled a gun on him before the shooting. Defendant admitted that he shot the victim with a .38 caliber revolver and that he later threw the gun into the Cumberland River. Defendant acknowledged that, following the shooting, he did not explain to police that he acted in self-defense. He agreed that he did not go back to his house after the shooting and that he stayed somewhere else until his arrest. Defendant agreed that he had been previously convicted of conspiracy to distribute fifty grams or more of cocaine base in federal court and that he had received a ten-year sentence. He agreed that he was on federal parole at the time of the shooting and was prohibited from carrying a weapon. Defendant also admitted that he "hung out" with Crips gang members. Towards the end of cross-examination, the following exchange occurred:

> [THE STATE:] [Ms. Draper] testified that you hang out with the Crips, or you have hung out with the Crips.
>
> [DEFENDANT:] I -- I have.
>
> [THE STATE:] Is that true?
>
> [DEFENDANT:] Yes, sir.
>
> [THE STATE:] All right. Do you know what color the Crips used to associate themselves with?
>
> [DEFENDANT:] Blue.

[THE STATE:] Like that color shirt you're wearing today?

[DEFENDANT:] Not at all.

[THE STATE:] No?

[DEFENDANT:] I mean, it could be various forms of blue.

[THE STATE:] All right.  One being the color shirt you've got on.

[DEFENDANT:] Yes, sir.

Following deliberations, the jury found Defendant guilty of first degree premeditated murder, as charged.  The trial court sentenced Defendant to life and ordered the sentence to run consecutively to any unexpired state or federal sentences.  Defendant filed a timely motion for new trial, which the trial court denied in a written order following a hearing.  Defendant filed a timely notice of appeal on June 5, 2017.

*Petition for writ of error coram nobis*

On March 7, 2018, Defendant filed a timely petition for writ of error coram nobis, asserting that he had newly discovered evidence that the victim and another individual outside of The Game Room at the time of the shooting were members of the Gangster Disciples and that, had the jury known this information, it would have found that Defendant was acting in self-defense when he shot the victim.  Defendant also filed a motion for stay of appeal in this court, requesting that the court stay his direct appeal so that he could pursue coram nobis relief.  On March 23, 2018, this court entered an order staying the direct appeal pending the disposition of the petition for writ of error coram nobis.

At a hearing before the trial court, Defendant submitted excerpts of transcripts from the trials of Kavaris Kelso and David Fletcher, who were tried in September 2017 and February 2018, respectively, for the retaliatory murder of Defendant's mother on September 14, 2015.  *See State v. Kavaris Lequan Kelso*, No. M2018-00494-CCA-R3-CD, 2020 WL 2109530, at *1 (Tenn. Crim. App. May 4, 2020), *perm. app. filed*; *State v. David Darrell Fletcher*, No. M2018-01293-CCA-R3-CD, 2020 WL 995795, at *1 (Tenn. Crim. App. Mar. 2, 2020), *no perm. app. filed*.  Defendant asserted that Mr. Eddings admitted during the trials of Mr. Kelso and Mr. Fletcher that the victim and Mr. Askins were members of the Gangster Disciples and that this information was critical to Defendant's claim of self-defense.  The State responded that the evidence presented by Defendant was not newly discovered, and therefore, Defendant was not entitled to relief.

- 15 -

The excerpts from the trial transcripts revealed that, on direct examination in Mr. Kelso's trial, Mr. Eddings again testified that he was a former member of the Gangster Disciples. He also identified other people who had been members with him, as follows:

[THE STATE]: I guess before we move into specifics, as far as facts go, let me ask you about these folks. I will start with you. Are you associated today with a gang?

[MR. EDDINGS]: No, sir.

[THE STATE]: Were you back in 2015?

[MR. EDDINGS]: Yes, sir.

[THE STATE]: What gang were you associated with?

[MR. EDDINGS]: Gangster Disciples.

[THE STATE]: Is there another way to identify the Gangster Disciples? How else would you call a Gangster Disciple?

[MR. EDDINGS]: A GD.

[THE STATE]: A G?

[MR. EDDINGS]: Yeah.

[THE STATE]: Would GD be appropriate?

[MR. EDDINGS]: Yes.

[THE STATE]: Are you currently a GD?

[MR. EDDINGS]: No.

. . . .

[THE STATE]: What about Desean Askins?

[MR. EDDINGS]: Yes.

On cross-examination, Mr. Eddings confirmed that the victim in this case was also a member of the Gangster Disciples:

> [DEFENSE COUNSEL]: [D]id you know Capone Caruth? You had his shirt on that night, didn't you?
>
> [MR. EDDINGS]: Yes.
>
> [DEFENSE COUNSEL]: Was he a Gangster?
>
> [MR. EDDINGS]: Yes.
>
> [DEFENSE COUNSEL]: How long had he been in?
>
> [MR. EDDINGS]: I'm not sure.

On direct examination in Mr. Fletcher's trial, Mr. Eddings again testified that the victim in this case was a member of the Gangster Disciples:

> [THE STATE]: Did you know a young man named Capone Caruth?
>
> [MR. EDDINGS]: Yes.
>
> [THE STATE]: Did you know him before September of 2015?
>
> [MR. EDDINGS]: Yes, sir.
>
> . . . .
>
> [THE STATE]: Was Capone in a gang?
>
> [MR. EDDINGS]: Yes, sir.
>
> [THE STATE]: What gang was Capone in?
>
> [MR. EDDINGS]: He was a G.
>
> [THE STATE]: And when you say G, tell the jury what a G is, what gang is that?
>
> [MR. EDDINGS]: Gangster Disciples.

[THE STATE]: Do you know, we have heard some testimony about this, are there other names for G's or Gangster Disciples?

[MR. EDDINGS]: Yes, sir. Growth & Development and GD, Gangster Disciples really.

[THE STATE]: That Growth & Development, where does that name come from?

[MR. EDDINGS]: I guess it is just part of the history that goes along with it.

[THE STATE]: Are you today in a gang?

[MR. EDDINGS]: No, sir.

[THE STATE]: Have you been in a gang in the past?

[MR. EDDINGS]: Yes, sir.

[THE STATE]: What gang were you in?

[MR. EDDINGS]: GD.

[THE STATE]: Same as Capone?

[MR. EDDINGS]: Yes, sir.

[THE STATE]: You say you are not a GD today, is that right?

[MR. EDDINGS]: Correct.

[THE STATE]: So does that mean you got out of the gang?

[MR. EDDINGS]: Yes, sir.

Mr. Eddings also confirmed that Mr. Askins was a member of the Gangster Disciples.

At the conclusion of the hearing, the trial court directed the parties to file post-hearing briefs and took the matter under advisement. Thereafter, the trial court denied

- 18 -

relief in a written order. The court determined that the victim's affiliation or membership in the Gangster Disciples was not newly discovered evidence. The trial court reasoned:

> Throughout the trial there were considerable questions to the witnesses regarding gang affiliations. Many denied either being in a gang or knowing whether others were in a gang. When the question regarding [the victim's] gang affiliation was posed to [Mr.] Eddings, he basically did not answer it one way or another, but stated "Still none of my business, sir." The fact that [Mr.] Eddings . . . may have directly answered the question in the Kelso and Fletcher trials does not constitute new evidence because this was a fact known already to the defense.

The trial court noted that, in a jury-out hearing, witness Myeisha Pullen testified that she attempted to diffuse the situation between the victim and Defendant by telling the victim "just walk away, it's not worth it." Ms. Pullen said that the victim responded, "[N]o, f . . . that, . . . I'm not bowing down to no n**ga, *I'm a G*[.]" The trial court found that, despite this proposed testimony, the defense did not call Ms. Pullen. The court concluded:

> Ms. Pullen was known to the defense pretrial. Presumably, she would have been interviewed and the defense would know of the remarks made by [the victim] to [Ms.] Pullen regarding his purported association with the [Gangster Disciples]. Therefore, [the victim's] association, if any, was not newly discovered in the context of coram nobis proceedings.

The trial court additionally found that, even if the evidence was newly discovered, Defendant failed to show how this evidence may have resulted in a different verdict. The court noted:

> Despite many denials to the contrary or claimed lack of knowledge by witnesses, the entire undertone of the trial suggested strongly there was a presence of gang activity, members or associates involved. To suggest this escaped the attention of the jury would be to disregard the entire tenor of the evidence regarding the many questions and insinuations of gang affiliations among those who testified.
>
> . . .
>
> Thus, regardless of whether [Mr.] Eddings was evasive in his answers herein and later testified [the victim] was, in fact, a [Gangster Disciple] in the Kelso and Fletcher trials, it is unlikely this fact might have resulted in a

different outcome for [Defendant]. Defense counsel well made his point during his examination of the [S]tate's witnesses, his own witnesses and argument.

The trial court entered its order denying the petition for writ of error coram nobis on July 2, 2019. On August 14, 2019, Defendant filed a motion to allow a late-filed notice of appeal as to the coram nobis proceeding, which this court granted. This consolidated appeal follows.

## II. Analysis

### A. Sufficiency of the evidence

Defendant contends that the trial court erred in failing to act as thirteenth juror and grant his motion for judgment of acquittal based on his claim of self-defense. Defendant argues that the facts at trial clearly indicated he was attempting to retreat to avoid further conflict with the victim, that his retreat was "cut off," and that he had "reason to fear for his life and act to preserve it."

Under Tennessee Rule of Criminal Procedure 29, a trial court "shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Tenn. R. Crim. P. 29(b). Whether to grant a motion for judgment of acquittal is a question of law, and the trial court must look at the State's evidence in the light most favorable to the State and must "allow all reasonable inferences from it in the State's favor; to discard all countervailing evidence, and if then, there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the evidence of the State," the trial court must deny the defendant's motion for judgment of acquittal. *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). In ruling on a motion for judgment of acquittal, the trial court looks at the legal sufficiency of the evidence and does not weigh the evidence. *Id.* "The standard by which the trial court determines a motion for a judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction[,]" *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013), whether, when the evidence is viewed in the light most favorable to the State, any rational juror could have found the defendant guilty of the offense beyond a reasonable doubt. *State v. Collier*, 411 S.W.3d 886, 893-94 (Tenn. 2013).

Rule 33(d) of the Tennessee Rules of Criminal Procedure states, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This rule is the modern equivalent of the "thirteenth juror rule"

- 20 -

and requires the trial court to weigh the evidence and grant a new trial "if the evidence preponderates against the weight of the verdict." *State v. Blanton*, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). Our supreme court has stated that this rule "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case[ ] and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). When a trial judge overrules a motion for new trial, absent any evidence that the trial court expressed dissatisfaction or disagreement with the weight of the evidence or the verdict, this court presumes that the trial judge has served as the thirteenth juror and approved the jury's verdict. *Id.* Once the trial court fulfills its duty as the thirteenth juror and imposes a judgment, appellate review is limited to determining the sufficiency of the evidence. *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995) (citing *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)).

Here, in denying Defendant's motion for a judgment of acquittal and motion for a new trial, the trial court found that the evidence was sufficient to support Defendant's conviction, and it expressed no disagreement with the jury's verdict before overruling Defendant's motion for new trial. *See Carter*, 896 S.W.2d at 122. "Because Defendant's argument regarding the motion for judgment of acquittal is essentially a sufficiency of the evidence claim and because the trial court fulfilled its role as thirteenth juror, we will address Defendant's arguments relating to his motion for judgment of acquittal and the trial court's role as thirteenth juror as raising one issue—the sufficiency of the evidence." *State v. Matthew Edwards*, No. E2017-02329-CCA-R3-CD, 2018 WL 5972775, at *4 (Tenn. Crim. App. Nov. 14, 2018), *perm. app. denied* (Tenn. Mar. 27, 2019).

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence

and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As charged in the indictment, premeditated first degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2015). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2015). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d) (2015). Additionally, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

Premeditation "may be established by proof of the circumstances surrounding the killing." *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Moreover, there are several factors which tend to support the existence of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of an intent to kill by the defendant, evidence of procurement of a weapon, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *Id.* Whether premeditation is present in a given case is a question of fact to be determined by the jury from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003) (citing *Suttles*, 30 S.W.3d at 261; *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998)).

When viewed in the light most favorable to the State, we conclude that the evidence is sufficient to support Defendant's conviction for first degree premeditated murder. The testimony at trial established that Defendant became engaged in an argument with the victim while at a party, after the victim accused Defendant of bumping into him. Defendant went outside with the victim and several others where Defendant said that he wanted to fight the victim. Defendant then threatened to shoot the victim in the face and kill him. Defendant pulled a concealed revolver from his waistband and shot the unarmed victim in the forehead at close range, resulting in the victim's death. Defendant fled the scene, and although he knew that he was wanted in connection with the shooting, he hid out in Shelbyville for a week before authorities located him. Multiple witnesses testified that, prior to the shooting, Defendant was not surrounded or threatened and that he could have walked away from the argument. From all of the circumstances surrounding the killing, the jury could have found that Defendant premeditatedly and intentionally killed the victim. *See Davidson*, 121 S.W.3d at 614.

Defendant testified at trial that he acted in self-defense. He claimed that the victim and the victim's gang-affiliated friends pursued him outside and prevented him from leaving and that he feared for his life after a "light-skinned guy" handed something to the victim. However, Defendant's testimony was contradicted by the multiple eyewitnesses who testified. The trial court properly instructed the jury on self-defense. Based on its verdict, however, the jury clearly rejected Defendant's testimony and his claim that he was acting in self-defense. Questions of fact, the credibility of witnesses, and weight of the evidence were resolved by the jury, and we will not reweigh the evidence on appeal. *Bland*, 958 S.W.2d at 659. Thus, Defendant is not entitled to relief on this claim.

## B. Improper prosecutorial argument

Citing *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003), Defendant contends that he is entitled to a new trial because the prosecutor improperly argued that Defendant was affiliated with, or a member of, the Crips gang and that Defendant's possession of a weapon as a convicted felon prevented his claim of self-defense.

In *Goltz*, this court listed five general areas of improper prosecutorial argument during closing:

> (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw;

> (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt;

> (3) making statements calculated to inflame the passions or prejudices of the jury;

> (4) injecting broader issues than the guilt or innocence of the accused; and

> (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

*Id.*

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App.

1976), this court listed the following factors to be considered when determining whether the improper argument of a prosecutor affected the verdict to the prejudice of the defendant:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

### 1. Defendant's alleged gang affiliation

Defendant asserts that, prior to trial, the prosecutor had access to a booking document, which "clearly indicate[d] that [Defendant] had no gang affiliation" at the time of his arrest. He contends that, despite this knowledge, the prosecutor elicited testimony from Mr. Eddings that Defendant told the victim he was a "Crip," repeatedly referred to Defendant as a "Crip," and questioned Defendant about his wearing a blue shirt during trial. He argues that the prosecutor "wrongfully misled the jury in portraying [Defendant] as a member of the 'Crips' gang, with no other possible purpose than to place [Defendant] in a bad light."

It is not clear from Defendant's argument in his brief, but to the extent that his argument could be interpreted as a claim under *Napue v. Illinois*, 360 U.S. 264, 269 (1959), and *Giglio v. United States*, 405 U.S. 150, 153-54 (1972),[2] Defendant has waived our consideration of the claim by failing to cite to relevant authority and present an adequate argument in his brief. Tenn. Ct. Crim. App. R. 10(b). Likewise, to the extent that Defendant is raising evidentiary challenges to the admission of Mr. Eddings' testimony about Defendant's statement before the shooting and to Defendant's testimony regarding the shirt he wore at trial, he has waived our consideration of the issues by failing to cite to relevant authority and present an adequate argument in his brief. *Id.*

Viewing Defendant's assertion that the prosecutor "wrongfully misled the jury in portraying [Defendant] as a member of the 'Crips' gang, with no other possible purpose

---

[2] It is well-established law that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269. As such, the State may not knowingly present false testimony, and it has an affirmative duty to correct the false testimony of its witnesses. *Giglio*, 405 U.S. at 153-54. In order to be granted a new trial based on the presentation of false testimony, the defendant must establish that "the State presented false testimony, the State knew the testimony was false, and the testimony was material." *State v. Cureton*, 38 S.W.3d 64, 74-75 (Tenn. Crim. App. 2000).

than to place [Defendant] in a bad light" as a claim under *Goltz*, we conclude that Defendant has waived our consideration of the claim by failing to raise a contemporaneous objection to any portion of the prosecutor's closing argument. *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008) ("The failure to make a contemporaneous objection constitutes waiver of the issue on appeal.") Moreover, Defendant has not established that he is entitled to plain error relief. *See State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007); *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994).

## 2. State's argument regarding law on self-defense

Defendant additionally asserts that the prosecutor improperly argued that he was engaged in unlawful activity based on possession of a gun at the time of the offense. Specifically, Defendant points to the prosecutor's argument that "[i]f a [d]efendant was not engaged in unlawful activity, and then you can keep reading from there. It's not self-defense. What I — what did he tell you he was doing? He was carrying a gun, illegally. His own testimony. It's not self-defense." Defendant contends that this argument was a misleading and inaccurate statement of the law, and he asserts that the comment was made at the very end of the prosecutor's closing argument "for the singular purpose of eliminating [Defendant's] claim of self-defense in the minds of the jurors."

As previously noted, however, Defendant did not make any contemporaneous objections during closing argument. Thus, Defendant has waived our consideration of the issue by failing to preserve it in the trial court. *Gilley*, 297 S.W.3d at 762.

We note that the Tennessee Supreme Court recently clarified that being a felon in possession of a weapon means that the felon has a duty to retreat before engaging in self-defense, but it does not mean that the felon can never use a weapon for self-defense. *See State v. Perrier*, 536 S.W.3d 388, 404 (Tenn. 2017). In this case, because Defendant's illegal possession of a gun triggered his duty to retreat but did not preclude him from acting in self-defense, the prosecutor's explanation of the law on self-defense was inaccurate.[3] However, Defendant cannot show that the error adversely impacted a substantial right or that consideration of the error is "necessary to do substantial justice." *See Adkisson*, 899 S.W.2d at 640-41. The prosecutor's comments about the law on self-defense were brief. Furthermore, the trial court instructed the jury that unlawful possession of a firearm *did not* prohibit a claim of self-defense and that the arguments of counsel were not the law. We presume that the jury followed the instructions as provided by the trial court. *State v. Jordan*, 116 S.W.3d 8, 18 (Tenn. Crim. App. 2003) (citing

---

[3] Although *Perrier* was decided after Defendant's trial, the law at the time of appeal is controlling for purposes of plain error review. *State v. Minor*, 546 S.W.3d 59, 74 (Tenn. 2018).

*State v. Vanzant*, 659 S.W.2d 816, 819 (Tenn. Crim. App. 1983)). Defendant is not entitled to relief on this claim.

## C. Writ of error coram nobis

Defendant asserts that he presented newly discovered evidence of the victim's and Mr. Askins' gang affiliation. He explains that, during Mr. Eddings' testimony at the subsequent trials of Mr. Kelso and Mr. Fletcher, Mr. Eddings "recanted" his prior testimony from Defendant's trial regarding the victim's gang affiliation and testified that both the victim and Mr. Askins[4] were members of the Gangster Disciples. Defendant argues that he was without fault in failing to present this newly discovered evidence at the appropriate time "in as much as Defendant's counsel attempted to question not only Mr. Eddings but other [S]tate witnesses . . . concerning gang affiliation that was either denied or answered evasively." Defendant argues that, had the jury been aware of the gang affiliation of the victim and Mr. Askins, the jury may have acquitted him based on his claim of self-defense.

The State responds that the trial court did not abuse its discretion in denying the petition for writ of error coram nobis. The State argues that Mr. Eddings' subsequent testimony was not a recantation of his testimony at Defendant's trial, that Defendant had evidence of the victim's gang affiliation at the time of trial, and that Mr. Eddings' subsequent testimony would not have affected the outcome of Defendant's trial had it been presented.

Tennessee Code Annotated section 40-26-105 provides relief in criminal cases by petition for error coram nobis and states in pertinent part:

> The relief obtainable by this proceeding shall be confined to error dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

---

[4] In his brief, Defendant states that the newly discovered evidence relates to Mr. Eddings' subsequent testimony about the gang affiliation of the victim "and others." However, from a review of the record, it appears that the only other person Mr. Eddings identified as a member of the Gangster Disciples who was also identified as being at the party at The Game Room was Mr. Askins.

Tenn. Code Ann. § 40-26-105(b) (2018).

The writ of error coram nobis is "an *extraordinary* procedural remedy," providing relief in only a limited number of cases. *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999) (emphasis in original). "The purpose of this remedy 'is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment.'" *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995) (quoting *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1966)). The decision of whether to grant or deny a petition for writ of error coram nobis on its merits rests within the sound discretion of the trial court. *Vasques*, 221 S.W.3d at 527-28; *Hart*, 911 S.W.2d at 375. Before granting relief, the evidence must establish, and the trial court must find, "that the subsequently or newly discovered evidence 'may have resulted in a different judgment had it been presented at the trial.'" *Hart*, 911 S.W.2d at 375 (quoting Tenn. Code Ann. § 40-26-105). The newly discovered evidence must be admissible and credible because the ultimate issue is whether the result at trial would have been different with all relevant evidence presented. *Wilson v. State*, 367 S.W.3d 229, 235 (Tenn. 2012), *overruled on other grounds by Nunley v. State*, 552 S.W.3d 800, 828 (Tenn. 2018). Accordingly, the trial court must be "reasonably well satisfied" with the veracity of the new evidence. *Vasques*, 221 S.W.3d at 527.

Recanted testimony can be a basis for error coram nobis relief. *Mixon*, 983 S.W.2d at 672. There are three requirements for that type of newly discovered evidence:

> (1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

*Id.* at 673 n.17; *State v. Ratliff*, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2003).

Upon review, we conclude that the trial court acted within its discretion in denying the petition for writ of error coram nobis. Defendant could not have known about the substance of Mr. Eddings' testimony in the subsequent trials of Mr. Kelso and Mr. Fletcher at the time of his trial; however, Defendant knew of the underlying fact of the victim's gang affiliation prior to or during trial. In fact, Defendant's entire self-defense theory was based on this knowledge. Defendant cross-examined the State's witnesses about their gang involvement, as well as the gang affiliation of the victim. Defendant also testified about the gang affiliation of several of the victim's friends, including Mr. Askins. In a jury-out hearing, Ms. Pullen testified that the victim said he was a member

of the Gangster Disciples during his confrontation with Defendant, and Defendant had Ms. Pullen detained as a material witness because she could provide this testimony about the victim's gang affiliation. Although Defendant chose not to call Ms. Pullen as a witness, he was clearly aware of the victim's gang affiliation at the time of trial. Therefore, Mr. Eddings' subsequent testimony is not newly discovered evidence for the purpose of error coram nobis relief. *See e.g., Harris v. State*, 301 S.W.3d 141, 161 (Tenn. 2010), *overruled on other grounds by Nunley*, 552 S.W.3d at 828; *Seay v. City of Knoxville*, 654 S.W.2d 397, 399 (Tenn. Ct. App. 1983) (stating that "to justify a new trial for newly discovered evidence it must be shown that the new evidence was not known to the moving party prior to or during trial"); David Louis Raybin, *Tennessee Practice: Criminal Practice and Procedure* § 33:32, at 495 (2008) ("If the defendant or his attorneys were aware of the evidence but chose not to use it, the proof is not newly discovered.").

Further, we agree with the trial court's determination that Mr. Eddings did not recant his testimony but simply declined to answer a question at Defendant's trial that he answered at the trials of Mr. Kelso and Mr. Fletcher, and Defendant has not established that the testimony of Mr. Eddings at his own trial was false. *See Mixon*, 983 S.W.2d at 673 n.17.

Finally, as noted in the trial court's order, the testimony during Defendant's trial suggested that gang affiliation played a part in this shooting. Defendant presented the issue of gang affiliation during the cross-examination of the State's witnesses and during his own testimony. Thus, even if Mr. Eddings' subsequent testimony could be considered newly discovered evidence, it would not have significantly changed the evidence already before the jury. As such, the trial court did not abuse its discretion by finding that Defendant failed to present newly discovered evidence that may have resulted in a different verdict if presented at trial. *See Hart*, 911 S.W.2d at 375. Defendant is not entitled to relief.

### III. Conclusion

Based on the foregoing reasons, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE